# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW LONDON ASSOCIATES, LLC,<br><br>             Plaintiff,<br><br>v.<br><br>KINETIC SOCIAL LLC,<br>SPECTRUM MEDIA SERVICES, LLC,<br>INTERNAP CORP.,<br>WESTERN ALLIANCE BANCORPORATION d/b/a/<br>BRIDGE BANK,<br>COSTELLA KIRSCH,<br>BLUE CHIP VENTURE COMPANY LTD,<br>BLUE CHIP VI EXTENSION FUND II LLC, and<br>MULTIPLIER CAPITAL LLC<br><br><br>             Defendants. | **Case No. 1:18-cv-7963**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT
### (INJUNCTIVE RELIEF AND DAMAGES DEMANDED)

Plaintiff NEW LONDON ASSOCIATES, LLC, by and through undersigned counsel,

brings this Complaint against the above captioned Defendants for damages and injunctive relief

for, *inter alia,* violations of the Copyright Act, and in support thereof Plaintiff states as follows.

## INTRODUCTION

1.    The Copyright Act of the United States provides, at 17 U.S.C. §106, that

"the owner of copyright under this title has *the exclusive rights* to do and to authorize any

of the following. . ." including "to reproduce," "to prepare derivative works," and "to

distribute copies … of the copyrighted work to the public by sale or other transfer of

ownership."

2. The Plaintiff in this case, New London Associates, is a software developer. New London has created, at considerable expense, valuable software that enables a specialized, and highly profitable, business model for certain businesses in the online advertising industry.

3. The Defendants in this case, through varying means and methodologies, have all profited or attempted to profit from New London's software without paying for it, and by violating New London's copyrights. For example, advertising companies like Kinetic and Spectrum have used, reproduced, prepared derivatives of New London's software in the operation of their advertising businesses, without paying for it. The Internap Defendant used access to, and assistance in copying, New London's software as a bargaining chip to secure contracts with Spectrum as a new customer for its co-location business, and in the process infringed New London's copyrights. Lastly, financial entities such as Multiplier Capital, Bridge Bank, Costella Kirsch, and the Blue Chip Defendants have taken New London's software and used it as an asset with which to raise capital, building companies (i.e. Kinetic and Spectrum) around New London's software, without owning or paying for it. Moreover, when Kinetic went out of business without paying Plaintiff for its software, rather than simply pay the debt, the financial entities orchestrated a sham "sale" of Plaintiff's software to a new company (Spectrum)—also controlled by them—and which continues to infringe. The financial entities and their members have at times stepped in and served as officers in the advertising companies, personally managing and directly participating in those entities' infringing activity.

## PARTIES

4. Plaintiff NEW LONDON ASSOCIATES LLC ("NLA") NLA is organized

under the laws of the state of Delaware, with a principal place of business at 130 West 30th Street, New York, NY 10001.

5.      Defendant KINETIC SOCIAL LLC ("Kinetic"), on information and belief, is a Delaware entity with its principal place of business at 134 West 37th Street, 7th Floor, New York, New York 10018.

6.      Defendant SPECTRUM MEDIA SERVICES LLC ("Spectrum"), on information and belief, is a Delaware entity with its principal place of business at 1460 Broadway, New York, New York 10036.

7.      Defendant INTERNAP CORP. ("INAP"), on information and belief, is a Delaware entity with its principal place of business at 12120 Sunset Hills Road, Suite 330, Reston, Virginia 20190. Internap's website shows that it has a place of business at 111 8th Avenue, New York, New York 10011; where Internap's agents may be found.

8.      Defendant WESTERN ALLIANCE BANCORPORATION, on information and belief, is a Delaware entity with a place of business in New York at 420 Lexington Avenue, Suite 300, New York, New York 10170, where its agents may be found. WESTERN ALLIANCE BANCCORPORATION does business under the name "Bridge Bank" (hereinafter, "Bridge Bank.")

9.      Defendant COSTELLA KIRSCH, on information and belief, is an unincorporated business partnership between several fictitious and natural persons including, but not limited to, Costella Kirsch, L.L.C. (a California entity), Costella Kirsch IV, L.P. (a Delaware entity), Costella Kirsch IV, LLC (a Delaware Entity), Costella Kirsch IV-A L.P. (a Delaware entity), Costella Kirsch V, L.P. (a Delaware Entity), Costella Kirsch V, LLC (a Delaware entity), Costella Kirsch Venture Partners I, L.P. (a

California entity), Costella Kirsch VI, LLC (a Delaware entity), Costella Kirsch VI, LP (a Delaware entity), Costella Kirsch VI-A, LP (a Delaware entity), and the natural persons Richard Ginn, Brandon Child, Beth Kelsey, and Bill Kirsch, who collectively hold themselves out as "Costella Kirsch" for the purpose of doing business in New York and in California, but are not registered to do business under that name in either state (hereinafter "Costella Kirsch"). Costella Kirsch has an office at 3500 Alameda de law Pulgas, Suite 150, Menlo Park, CA 94025.

10.     Defendant BLUE CHIP VENTURE COMPANY LTD. ("Blue Chip Ltd."), on information and belief, is an entity organized under the laws of the state of Ohio, with a principal place of business at 1120 Scripps Center, 312 Walnut Street, Cincinnati, Ohio, 45202, and also having or holding itself out as having a place of business in New York.

11.     Defendant BLUE CHIP VI EXTENSION FUND II LLC ("Blue Chip Fund"), on information and belief, is a Delaware entity with its principal place of business at 1120 Scripps Center, 312 Walnut Street, Cincinnati, Ohio, 45202, and also having or holding itself out as having a place of business in New York.

12.     Defendant MULTIPLIER CAPITAL, LLC ("Multiplier"), on information and belief, is a Delaware Limited Liability Company having a place of business at 444 Madison Avenue, Suite 1800, New York, New York 10022, and may be served with process in this District at its registered agent CT Corporation System, 111 Eighth Ave., New York, New York 10011.

## SUMMARY OF THE ACTION

13.     Plaintiff brings this action for violations of its exclusive rights under the Copyright Act, 17 U.S.C. § 106, to reproduce, prepare derivative works, and distribute NLA's original copyrighted work of authorship, namely a software program (known as "RTR."). NLA has a Federal Copyright registration on RTR, #TX0008578620, attached as Exhibit A.  At all relevant times NLA was the owner of the copyrighted Work and is the true owner of any derivative works thereof.

14.     Defendants reproduced, prepared derivative works, and distributed RTR, committing the alleged infringements for the ultimate purpose of using RTR software as the underlying infrastructure necessary to run their business venture(s), while repeatedly avoiding payment to NLA for the software. Defendants directly infringed, contributed to the infringement, and/or induced infringement of Plaintiff's copyrights.

15.     Additionally, Plaintiff brings this action for breach of contract, unjust enrichment, conversion, tortious interference, violations of the New Jersey Computer Act, and violations of the Federal Computer Fraud and Abuse Act.

## JURISDICTION AND VENUE

16.     This is an action arising under the Copyright Act, 17 U.S.C. § 101 *et seq*.

17.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

18.     Each of the Defendants are subject to personal jurisdiction in this District on the claims alleged against them herein at least because each of them has infringed the copyrights of the Plaintiff, directly or indirectly; Plaintiff resides in New York and its copyrights and copyrighted works are located here; and thus New York is the situs of the injury of copyright

infringement.

19.    On information and belief, Kinetic's and Spectrum's principal places of business are in New York, subjecting them to general personal jurisdiction in this District.

20.    This Court has personal jurisdiction over Bridge Bank and Costella Kirsch on these claims because, on information and belief, the infringements by Bridge Bank and Costella Kirsch complained of occurred in New York, the infringements by Bridge Bank and Costella Kirsch resulted from instructions those parties made to their agents and other parties located in New York, Bridge Bank and Costella Kirsch have exercised management and other authority over New York entities Kinetic and Spectrum with respect to the infringements complained of herein.

21.    This Court has personal jurisdiction over Multiplier Capital on these claims because, on information and belief, Multiplier Capital has a place of business in New York, the infringements by Multiplier Capital complained of occurred in New York, the infringements by Multiplier Capital resulted from instructions Multiplier Capital made to their agents and other parties located in New York, and Multiplier Capital has exercised management and other authority over New York entities Kinetic and Spectrum with respect to the infringements complained of herein.

22.    This Court has personal jurisdiction over INAP on these claims because, on information and belief, INAP is registered to do business in New York State with the Department of Corporations and has a registered agent for the service of process in New York, INAP's agents may be found within this District at INAP's data centers and offices in New York City,  INAP has had, at all relevant times, employees, offices, real estate, and ongoing and systematic business in New York,  one those agents, Colin Gribbin, was and has been based in

New York at all relevant times by INAP, the infringements by INAP complained of herein occurred due to requests to and/or instructions from Mr. Gribbin while he was within the State of New York servicing clients also located within the State of New York, and when NLA began its relationship with INAP, NLA's servers were originally housed in INAP's data center in New York (those servers were later moved to New Jersey only when INAP closed that New York data center).

23.     This Court has personal jurisdiction over Blue Chip Ltd. and Blue Chip Fund because, on information and belief, the Blue Chip defendants regularly conduct business in New York, hold themselves out as being located and/or having a presence in New York City (*see* screenshot of Blue Chip's website below), and were intimately involved in the management and operation of Twelvefold, Kinetic, and Spectrum, in the infringements complained of herein, and/or in the "asset sales" that transferred NLA's copyrighted works between them.



*Figure 1: Screen-Capture from Blue Chip Venture Company's Website on 22 October 2018, bearing the claim "Cincinnati & New York," superimposed over an image of the Manhattan Skyline*

24.     Venue is proper in this district under 28 U.S.C. § 1391 and 1400(a) because Defendants engaged in infringement in this district, are subject to personal jurisdiction in this district, reside in this district, and/or their agents may be found in this district.

**FACTS**

25.     TWELVEFOLD MEDIA INC. ("Twelvefold"), on information and belief, was an entity with its principal place of business at 1261 Howard Street, 2nd Floor, San Francisco, California 94103.

26.     NLA entered into agreement(s) with Twelvefold in 2011 under which NLA

agreed to provide certain computer software and hardware solutions to Twelvefold Media, including but not limited to the software now known as RTR[1], in return for the promise of money that was never paid. NLA provided the software and hardware to Twelvefold in accordance with its obligations. Specifically, NLA created the software and setup the software so that Twelvefold could use the software to run its business. The software was installed onto NLA servers at server hosting space rented from INAP in New York City. Later, those servers were moved to INAP's facility in Secaucus, New Jersey. INAP provided internet access to the servers so that the servers could perform their functions and could be accessed via the internet by Twelvefold's (and later, Kinetic's, and later Spectrum's) personnel and other servers.

27. NLA also provided Twelvefold with access to the source code of RTR via Github. This access and the source code was later copied and used by Kinetic and Spectrum without NLA's permission. Github is an online computer program source code hosting service that allows, *inter alia*, programmers in various locations to modify the source code of a program to configure it or to add new features. To use Github to modify the source code of a program, generally a programmer makes a local copy of the source code on their computer (a reproduction under §106), modifies that local copy (creation of a derivative work under §106), uploads the changes (a reproduction under §106), and causes the new version to be installed onto the physical servers (a reproduction under §106). Twelvefold, Kinetic, and Spectrum's programmers used Github (and later, Atlassian) to work with the source code of RTR on dozens of occasions, each time violating NLA's copyrights. At least two such programmers—Peter Morgan and Michael Holt—are employees of Kinetic or Spectrum, and

---

[1] Originally referred to by, *inter alia*, RTC.

are residents of New York.

28.     Twelvefold Media eventually defaulted on its obligations to NLA, but continued to use, make copies of, create derivative works of, and distribute the software without authorization. Subsequently, Twelvefold agreed to settle its debt to NLA in exchange for a discount and a guarantee of payment, but Twelvefold defaulted on this agreement as well and did not honor the guarantee.  At least because Twelvefold had defaulted on its obligations to NLA, Twelvefold's use, possession, and modification of RTR, and its use of Github to work with RTR, was unlicensed, and Twelvefold was an infringer of NLA's copyrights.

29.     In 2015, Twelvefold's Chairman, Peter Horan, personally ordered employees of Twelvefold, believed to be Jay Budzik and Mike Noe, to transfer a copy of the RTR source code to Twelvefold's creditors, believed to include the defendants Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and/or Multiplier Capital (the "Lender Entities,") even though Twelvefold did not own RTR. On information and belief, Horan and other Twelvefold personnel were ordered to carry out copying the RTR source repository and distribute it to the Lender Entities, for subsequent distribution to Kinetic, for the purpose of enabling Kinetic's online advertising business model, which was dependent on New London's RTR software.

30.     Twelvefold and the Lender Entities had actual knowledge that Twelvefold did not have a license to RTR.  NLA's CEO personally informed agents of Twelvefold and Costella Kirsch that NLA owned the IP to RTR and had not been paid for it. The matter was discussed via email at least on 19 May 2016 between agents for Twelvefold, Kinetic, Costella Kirsch, Bridge Bank, and Blue Chip Ltd.

31.     The Lender Entities partially or completely owned and/or controlled Twelvefold and Kinetic (and later, Spectrum), and managed the acquisition of Twelvefold's assets by Kinetic (and later, of Kinetic's assets by Spectrum).  Of primary interest in this matter is that the Defendants purported to include NLA's copyrighted works in with Twelvefold's assets, even though Twelvefold had no license or ownership interest in NLA's copyrighted works.  On information and belief, the Lender Entities were involved with, and were aware of the details of, the transactions—including Twelvefold's lack of a software license to RTR—and NLA's express objection to the transfer.  On information and belief, the Lender Entities conspired with Twelvefold and Kinetic (and later, Spectrum) to distribute the software from one entity to another via "asset sales, " thereby inducing and/or contributing to the infringement of Kinetic (and later, Spectrum) and their personnel by encouraging and/or instructing them not to pay the debt to, nor obtain a license from, NLA, nor to cease use of NLA's copyrighted works, but rather to continue their unlicensed use of RTR.

32.     The Lender Entities, directly or through natural persons who were their partners or agents, directly participated in the purported asset sales and the management and operations of Kinetic and Spectrum which resulted in some of the infringements complained of herein.  This involvement includes, but is not limited to: (1) Jack Wyant, Mark Wright, and Chris McCleary of Blue Chip Ltd. were intimately involved in the Twelvefold acquisition by Kinetic and an investment by Blue Chip into Twelvefold and Kinetic, and Mr. McCleary was also the CFO at Kinetic during the relevant times.  Richard Kiley is a venture partner of Blue Chip and was the chairman of Kinetic's board during its acquisition of Twelvefold. (2) Mike Lederman of Bridge Bank was the factor for Twelvefold and controlled the checking account, approving specific creditors, expenses, and payments.  Mr. Lederman had the authority to

authorize payment to NLA on Twelvefold's debt to NLA but did not, because Bridge Bank and Mr. Lederman were coordinating with the other Lending Entities, behind the scenes, to "transfer" NLA's software to Kinetic as part of an asset sale, even though Twelvefold did not own it. (3) Henry O'Connor of Multiplier Capital, which was a senior secured debt lender, coordinated with Bridge Bank and a subordinate lender, Costella Kirsch, to obtain NLA's copyrighted software from Twelvefold and distribute it to Kinetic. (4) Richard Ginn, a partner of Costella Kirsch, along with Henry O'Connor, caused Twelvefold to be put into technical default of its credit obligations and then used the resulting default to transfer NLA's copyrighted software from Twelvefold to Kinetic, in violation of NLA's copyrights.

33. At Twelvefold's instruction, a new source code repository was established with Atlassian (a competitor of Github, offering a similar source code repository service.) That new repository was used by Twelvefold, and later Kinetic and Spectrum, but the original repository at Github continued to be used (including by the infringing parties) as recently as April of 2018. Twelvefold's assets were acquired by Kinetic in 2016 via an "asset sale," completed under the supervision of the Lender Entites. Kinetic then went back to key creditors and made deals to continue services that were critical to the functioning of Kinetic's product(s), including but not limited to AppNexus, a service that interoperated with RTR. Because neither Twelvefold nor Kinetic had a license, Kinetic's use, possession, and modification of RTR was unlicensed. Thus, Kinetic is or was an infringer of NLA's copyrights.

34. After the Twelvefold asset sale, Kinetic issued a note to NLA in the amount of one million dollars for a setup fee, as well as a separate equipment rental agreement for NLA's computer servers. Kinetic defaulted on the note and the rental agreement in 2016 and never

paid for RTR. In November 2017, NLA filed suit against Kinetic and ultimately obtained a judgment against Kinetic on 18 May 2018 in the amount of $893,570.09 (eight hundred and ninety-three thousand, five hundred and seventy dollars and nine cents US) from the Supreme Court of the State of New York, New York County, Index No. 656976/2017.

35.     The physical property, namely computer servers, which were the subject of NLA's agreement with Kinetic were housed and maintained at that time in Defendant INAP's computer data center in New Jersey.

36.     In 2017, NLA filed an action for and ultimately obtained on or about 15 March 2018 an *Order of Replevin* to repossess NLA's server hardware from INAP and Kinetic, in the Superior Court of the State of New Jersey, Hudson Vicinage.

37.     NLA has demanded access to the computer equipment in order to allow NLA to take possession of the equipment and INAP has refused to provide access in accordance with the *Order of Replevin.*

38.     Kinetic never returned NLA's copyrighted software RTR, which was the subject of the Agreement with NLA.  Instead, during the pendency of NLA's action(s) in the New Jersey Superior Court against Kinetic, Kinetic purported to sell its assets—including RTR, which it did not own or have a license to, and thus was not an asset of Kinetic but in fact was an asset of NLA—at another private asset sale to Spectrum.  This asset sale was again completed under the supervision and orders of the Lender Entities.  But, because Kinetic did not own and had no license to RTR, it could not sell or distribute it.  As discussed herein, Kinetic's possession, use, modification, reproduction, and/or distribution of RTR was unlicensed and therefore its transfer to Spectrum was an infringement of NLA's copyrights, including the right to reproduce and to distribute.  Additionally, as discussed herein, the

Lender Entities were aware of this, having previously been informed that NLA owned the IP rights to the RTR and had not been paid for it.

39.     On information and belief, some of the Lender Entities (including defendants Blue Chip Ventures Ltd., Blue Chip Fund, and Multiplier Capital LLC) reproduced and distributed, or ordered others to reproduce and distribute, copies of NLA's copyrighted works to Spectrum, under the guise of a so-called "asset sale."  The Lender Entities knew that Kinetic did not have legal title to NLA's software, and thus it was not an "asset" that could be sold or transferred to Spectrum.  Nonetheless, those Lender Entities conducted the "asset sale" for the purpose of enabling Spectrum to operate its business and to increase the value of the Lender Entities' investment(s) in Spectrum.

40.     Subsequent to Kinetic's purported asset sale, on or about March 30, 2018, NLA (in New York) was informed by Colin Gribbin, INAP's agent (in New York), that INAP had received and complied with a request from Spectrum (in New York) to provision a high-speed network connection in INAP's Secaucus, NJ datacenter between NLA's computer servers and Spectrum's computer servers, thus permitting and assisting Spectrum to access NLA's hardware and software.  Such a network connection is known as a "cross connect," and consists of one or more network cables that connect the machines in one customer's cage with the machines in another customer's cage.  The network connection was intended for, and was used for, high-speed access to and copying of NLA's copyrighted RTR software off of NLA's computers and onto Spectrum's computers.  Because neither Kinetic, Spectrum, or INAP had a license to RTR, this act was both a reproduction and a distribution of RTR in violation of NLA's copyrights.

41.     It is very unusual for a supposedly "secure" datacenter operator like INAP to

permit one customer to access the machines and information of another customer, circumventing security and access controls such as firewalls, by physically connecting those machines with network cable so as to bypass the security measures. Such a connection is called a "cross-connect" and is typically only permitted between *consenting* customers or tenants of a co-location space, because such a physical connection has significant security risks to the machines so connected. NLA did not consent to the installation of a cross-connect with Spectrum's cage.

42. On information and belief, INAP personnel assisted Spectrum and/or Kinetic personnel in the copying of NLA's copyrighted computer program RTR, thereby contributing and/or inducing such infringement. In the alternative, Spectrum and/or Kinetic contributed or induced the infringement of INAP's direct infringement.

43. On information and belief, INAP knew or should have known that the purpose of the data connection request between NLA's and Spectrum's servers was to facilitate the copying of NLA's proprietary software. INAP was notified on multiple occasions that Kinetic had defaulted and was informed that no one should have access to the computer servers, which were the property of NLA and the subject of legal proceedings. Additionally, NLA had requested numerous times that the servers be shut down by INAP to prevent damage to them, or surveillance of the information contained thereon. INAP refused to shut down the servers, instead leaving them operational and permitting third parties to access them.

44. INAP's contract with NLA does not allow INAP to provide third parties with access to NLA's equipment or software.

45. On information and belief, INAP has a general policy against permitting one

customer to access the assets of another customer hosted in its datacenters.

46.     INAP violated this policy, as well as its contract with NLA, to facilitate the copying, and copyright infringement, of Spectrum. On information and belief, INAP breached its own policy in this regard in an attempt to entice Spectrum as a customer of its data center services and to secure a lucrative co-location agreement with Spectrum.  As such, INAP has directly infringed, contributed to the infringement of Spectrum and/or Kinetic, conspired with Spectrum and/or Kinetic to infringe, and/or induced the infringement of Spectrum and/or Kinetic.

47.     On information and belief, NLA understands that, after Kinetic defaulted on its rent payment obligations to INAP for rental of co-location space (also known as a "cage"), INAP decided to hold Spectrum responsible, and sent a bill to Spectrum, for a portion of the rent owed on Kinetic's cage since Spectrum had, with INAP's assistance, used Kinetic's cage, and the hardware in it, to copy the software off of the servers in the Kinetic cage, over the cross-connect provided by INAP, to Spectrum's new cage.  NLA also understands that INAP did receive at least partial payment on the bill. Thus, not only did INAP participate in Kinetic and Spectrum's infringement of NLA's copyrights, INAP actually has profited from such infringement.

48.     As late as 13 April 2018, agents of Spectrum have used access to NLA's Github repository to modify RTR, thus creating derivative works in violation of §106.

49.     NLA has never issued any license to Twelvefold, Kinetic, Spectrum, the Lender Entities, or any of their principals, investors, financiers, or assignees.

## COUNT I – INFRINGEMENT BY REPRODUCTION

50.     NLA incorporates the allegations of each of the foregoing paragraphs as if

fully set forth herein.

51.     Each of the Defendants Kinetic, Spectrum, and INAP directly infringed NLA's copyrights in RTR by reproducing NLA's copyrighted work, at least in the course of their use, modification, installation, and other workings with RTR, and also in the course of creating copies to distribute to other entities.

52.     Additionally, Defendant INAP indirectly infringed NLA's copyrights by contributing to the infringement of Kinetic and Spectrum by assisting and conspiring with Kinetic and Spectrum in the reproduction of NLA's copyrighted work RTR in the course of helping Spectrum copy RTR from NLA's servers to Spectrum's servers.

53.     Additionally, or in the alternative, Defendant INAP has directly infringed NLA's right to reproduce RTR by copying it from NLA's servers to Spectrum's servers, and Defendants Kinetic and Spectrum have contributed or induced INAP's infringement.

54.     The Lender Entities, including Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and Multiplier Capital, contributed and/or induced the infringement of at least Kinetic and Spectrum, and possibly INAP, by instructing or otherwise causing them to reproduce NLA's copyrighted work purportedly pursuant to an "asset sale" when the Lender Entities knew that none of the Defendants had any rights or licenses to NLA's copyrighted works.

## COUNT 2 – INFRINGEMENT BY PREPARATION OF DERIVATIVE WORKS

55.     NLA incorporates the allegations of each of the foregoing paragraphs as if fully set forth herein.

56.     Each of the Defendants Kinetic and Spectrum directly infringed NLA's copyrights in RTR by preparing derivative works based on NLA's copyrighted work, RTR

at least in the course of their use, modification, installation, and other workings with RTR.

57.     The Lender Entities, including Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and Multiplier Capital, contributed to and induced Kinetic and Spectrum's infringement by instructing or otherwise causing them to create derivatives of NLA's copyrighted work(s) including through the operation of Kinetic and/or Spectrum's businesses operations, when the Lender Entities knew that none of the Defendants had any rights or licenses to NLA's copyrighted works.

## COUNT 3 – INFRINGEMENT BY DISTRIBUTION

58.     NLA incorporates the allegations of each of the foregoing paragraphs as if fully set forth herein.

59.     Defendant Kinetic directly infringed NLA's copyrights in RTR by, *inter alia,* distributing one or more copies of RTR to Spectrum when it copied and permitted the transfer of RTR to Spectrum.

60.     Additionally, or in the alternative, Defendant INAP directly infringed NLA's copyrights in RTR by distributing one or more copies of RTR to Spectrum at least when it assisted Kinetic and Spectrum in copying RTR from NLA's servers to Spectrum's servers.

61.     Additionally, or in the alternative, Defendant INAP indirectly infringed NLA's copyrights in RTR by contributing to the infringement of Kinetic by assisting and conspiring with Kinetic and Spectrum to copy NLA's copyrighted software RTR from NLA's servers to Spectrum's servers.

62.     The Lender Entities, including Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and Multiplier Capital, directly infringed NLA's copyrights in RTR, through their employees or agents, by distributing RTR to Kinetic in connection with the

Twelvefold asset sale to Kinetic, and then again by distributing RTR to Spectrum in connection with the Kinetic asset sale to Spectrum.

63. Cumulatively and/or in the alternative to the foregoing, the Lender Entities, including Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and Multiplier Capital, indirectly infringed NLA's copyrights in RTR by instructing other individuals, entities, or subordinates to distribute RTR to Kinetic in connection with the Twelvefold asset sale, and then again by distributing RTR to Spectrum in connection with the Kinetic asset sale.

## COUNT 4 -- BREACH OF CONTRACT

64. NLA incorporates the allegations of each of the foregoing paragraphs as if fully set forth herein.

65. Defendant INAP has breached its contract with NLA, and as a result NLA has been damaged. Specifically, INAP has breached its contractual obligations to safeguard NLA's property and maintain the security of NLA's servers and information in its datacenter.

## COUNT 5 -- CONVERSION

66. NLA incorporates the allegations of each of the foregoing paragraphs as if fully set forth herein.

67. Defendants INAP, Spectrum, Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and Multiplier Capital have converted the computer hardware, software, and intellectual property of NLA for their own use, and as a result NLA has been damaged.

68. Spectrum has converted NLA's property for its own use by using NLA's RTR software and copyrighted works to run its business and using NLA's computer servers

to copy that software and other information to its own servers, without paying for the same.

69.     Defendant INAP has converted NLA's property for its own use by offering access to and the use of NLA's servers, software, and information, in INAP's possession, as a bargaining chip and inducement to obtain a contract from Spectrum.

70.     The Lender Defendants have converted NLA's property for their own use by treating it as an asset which they can move between entities to try and capitalize new startup ventures.

## COUNT 6 -- TORTIOUS INTERFERENCE

71.     NLA incorporates the allegations of each of the foregoing paragraphs as if fully set forth herein.

72.     Defendants INAP, Spectrum, Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and Multiplier Capital have tortiously interfered with NLA's prospective economic advantage, business relationships, prospective business relationships, customer relationships, and other expectations and interests NLA has and had, and as a result NLA has been damaged.

73.     Due to its ownership of the RTR software, copyrights, and its server hardware, NLA has or had prospective and actual economic advantages, business relationships, and customer relationships.  NLA expected that a new company in the online advertising space, such as Spectrum, would purchase its software.  Moreover, there was a reasonable likelihood of such a relationship given that the Lender Entities were familiar with Kinetic's and Spectrum's reliance on NLA's software, and an awareness of that likely relationship by Spectrum and the Lender Entities because prior employees of Kinetic were also employed by Spectrum.  Spectrum tortuously interfered with NLA's expectation rights

by copying from Kinetic what Kinetic had failed to pay NLA for, and was supposed to return.  Bridge Bank, Costella Kirsch, Blue Chip Ltd. and Blue Chip Fund, and Multiplier capital tortuously interfered with these expectations by causing Spectrum to infringe NLA's copyrights rather than purchase the software.

74.    INAP tortuously interfered with NLA's expectations by infringing NLA's copyrights and assisting Spectrum in copying NLA's software and in accessing and using NLA's server hardware.

### COUNT 7 -- NEW JERSEY COMPUTER ACT

75.    NLA incorporates the allegations of each of the foregoing paragraphs as if fully set forth herein.

76.    In violation of NJ Rev. Stat. §2A:38A-3, Defendants INAP, Kinetic, and Spectrum have purposefully, knowingly, and without authorization accessed NLA's computer(s), computer system(s), and computer network(s), at least when they physically and logically accessed NLA's computer servers for the purpose of surveilling and copying information off of them.

77.    On information and belief, the Defendants listed in the foregoing paragraph, in concert with Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and Multiplier Capital have conspired amongst themselves to commit the acts described therein.

### COUNT 8 -- COMPUTER FRAUD AND ABUSE ACT

78.    NLA incorporates the allegations of each of the foregoing paragraphs as if fully set forth herein.

79.    NLA's computer servers were used in interstate commerce and

communication and are thus protected computers under the Computer Fraud and Abuse Act.

80. In violation of 18 U.S.C. §1030(a)(2), Defendants INAP, Kinetic, and Spectrum have intentionally accessed a protected computer used in interstate commerce of NLA, without authorization and/or in excess of their authorization, and thereby obtained information, causing damages and loss to NLA in excess of $5,000 in value, and affecting 10 or more protected computers during a 1-year period, at least when they physically and logically accessed NLA's computer servers for the purpose of surveilling and copying information off of them, without authorization.

81. In violation of 18 U.S.C. §1030(a)(5), Defendants INAP, Kinetic, and Spectrum have intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damages and loss to NLA in excess of $5,000 in value, and affecting 10 or more protected computers during a 1-year period, at least when they physically and logically accessed NLA's computer servers for the purpose of surveilling and copying information off of them, without authorization.

82. Bridge Bank, Costella Kirsch, Blue Chip Ltd., Blue Chip Fund, and Multiplier Capital have conspired with the Defendants mentioned in the foregoing paragraphs to commit the offenses described therein.

83. Pursuant to 18 U.S.C. §1030(g), NLA is entitled to damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants:

a. A Declaration that Defendants' infringement was willful,

b. That Defendants and their officers, agents, servants, employees, affiliated entities, and all of those in active concert with them, be preliminarily and permanently enjoined from

committing the acts alleged herein in violation of 17 U.S.C. § 501 and other applicable law;

    c.    That Defendants be required to pay Plaintiff their actual damages and profits attributable to the infringement, or, at Plaintiff's election, statutory damages and an increased award thereof, as provided in 17 U.S.C. § 504 and other applicable law.

    d.    That Plaintiff be awarded its attorneys' fees and costs of suit pursuant to 17 U.S.C. § 505 and other applicable law;

    e.    That Plaintiff be awarded compensatory damages, punitive damages, attorneys fees and costs of suit including costs of investigation and litigation pursuant to N.J. Rev. Stat. § 2A:38A-3 and other applicable law,

    f.    That Plaintiff be awarded compensatory damages, injunctive relief, and equitable relief pursuant to 18 USC §1030(b); and

    g.    Plaintiff be awarded such other and further relief as may be lawful for the offenses complained of herein, or that the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

DATED: 30 October 2018           Respectfully submitted,


                            */s/ Erik Dykema*
                            **ZELLER IP GROUP PLLC**
                            Erik Dykema

                            *Attorneys for Plaintiff New London Associates LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record registered for electronic filing on October 30, 2018, via the Court's ECF system in accordance with S.D.N.Y. Local Civil Rule 5.2.

*/s/ Erik Dykema*
*Erik Dykema*