UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
NEW LONDON ASSOCIATES, LLC,            :
                                       :
                      Plaintiff,       :        18cv7963(DLC)
                                       :
            -v-                        :        OPINION AND ORDER
                                       :
KINETIC SOCIAL LLC, SPECTRUM MEDIA     :
SERVICES LLC, INTERNAP CORP., COSTELLA :
KIRSCH, BLUE CHIP VENTURE COMPANY LTD.,:
BLUE CHIP VI EXTENSION FUND II LLC, and:
MULTIPLIER CAPITAL LLC,                :
                      Defendants.      :
                                       :
---------------------------------------X

APPEARANCES

For the plaintiff:
Erik Dykema
Craig L. Uhrich
Zeller IP Group PLLC
155 Water Street, Suite 6-6
Brooklyn, New York 11201

For defendant Internap Corporation:
Jeffrey L. Nagel
Kevin G. Walsh
J. Brugh Lower
Gibbons P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119

For defendants Blue Chip Venture Company Ltd. and Blue Chip VI
Extension Fund II LLC:
Allen G. Kadish
Lance A. Schildkraut
Archer & Greiner, P.C.
630 Third Avenue
New York, New York 10017

For defendant Costella Kirsch:
Steven M. Frederick
Wofsey, Rosen, Kweskin & Kuriansky, LLP

600 Summer Street
Stamford, CT 06901

For defendant Multiplier Capital LP:
Adam Cole
Chipman Brown Cicero & Cole, LLP
501 Fifth Avenue, 15th Floor
New York, New York 10017

Leo D. Plotkin
Levy, Small & Lallas
815 Moraga Drive
Los Angeles, California 90049


DENISE COTE, District Judge:

Defendants Costella Kirsch, Internap Corporation ("INAP"), Blue Chip Venture Company Ltd.[1] and Blue Chip VI Extension Fund II LLC (the "Blue Chip Defendants"), have moved pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the claims against them in the Second Amended Complaint ("SAC"). INAP and the Blue Chip Defendants have additionally moved to dismiss the SAC for lack of personal jurisdiction pursuant to Rule 12(b)(2), Fed. R. Civ. P. Defendants Spectrum Media Services LLC ("Spectrum") and Multiplier Capital LLC ("Multiplier") have moved for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P., joining in arguments made by the other moving defendants. For the

---

[1] Blue Chip Venture Company Ltd. asserts that it is not a proper defendant in this action because it has no relationship with any of the parties or the transactions at issue, but rather is a management company for an unrelated fund that is not an investor or participant in any of the entities relevant to this action. Because the plaintiff has failed to state a claim against any Blue Chip entity, this argument need not be addressed.

reasons that follow, the Blue Chip Defendants', INAP's, and Costella Kirsch's motions to dismiss are granted.  Multiplier's motion for judgment on the pleadings is granted.  Spectrum's motion for judgment on the pleadings is granted in part.

## Background

The following facts are alleged in the SAC and are assumed to be true for the purpose of addressing this motion.  Plaintiff New London Associates, LLC ("NLA") is a software developer.  NLA owns a federal copyright registration for a software program known as "RTR."[2]

In 2011, NLA entered into an agreement with nonparty Twelvefold Media Inc. ("Twelvefold"), in which NLA agreed to provide the RTR software to Twelvefold in return for a promised payment, which was never received.  NLA alleges that it installed the RTR software on an NLA server that was located at a server hosting space in New York City that it rented from INAP.  INAP provided internet access to the servers so that the servers could be accessed via the internet by Twelvefold.  The servers were subsequently moved to an INAP facility in Secaucus, New Jersey.  NLA also provided Twelvefold with access to the source code to RTR via Github, an online source code hosting

_____

[2] The SAC indicates that this software program is also known as "RTC."  The software will be referred to as RTR throughout this Opinion.

service that allows programmers to remotely access and modify the source code. As NLA alleges, this is generally accomplished by downloading a local copy of the source code, modifying that local copy, and then uploading the modified copy onto Github.

At an unspecified date, Twelvefold defaulted on its obligations to NLA. NLA alleges that, notwithstanding its failure to make the required payments to NLA, Twelvefold continued to use and modify the RTR software through Github. At an unspecified date, Twelvefold agreed to settle its debt to NLA in exchange for a discount and a guarantee of payment, but it defaulted on that obligation as well. Accordingly, NLA alleges that Twelvefold did not own and was not licensed to use RTR.

In 2016, Twelvefold's assets were acquired by defendant Kinetic Social LLC ("Kinetic") in an asset sale completed under the "supervision" of Multiplier, the Blue Chip Defendants, and Costella Kirsch (collectively, the "Financing Entities"), as well as non-party Bridge Bank.[3] The Financing Entities allegedly conditioned their funding of Kinetic upon the distribution of the RTR software to Kinetic and to an escrow service. The SAC references an email from Chris McCleary, Kinetic's CFO, to Twelvefold and Costella Kirsch, stating "Guys, we will need the

---

[3] The SAC also named "Western Alliance Bancorporation, d/b/a/ Bridge Bank" as a defendant. The claims against this defendant were voluntarily dismissed on January 30, 2019.

entire code base in escrow before closing.  Let us know what we can do to make this happen."  NLA asserts that McCleary was also the "agent" of the Blue Chip Defendants.  The SAC also references an email discussion regarding McCleary's request, in which Rich Ginn, a partner of Costella Kirsch, wrote "Costella Kirsch is ok with this request."  NLA also asserts that Multiplier was aware of McCleary's request and NLA's objections to it, but does not offer further details.

NLA alleges that, prior to the asset sale to Kinetic, Twelvefold's Chairman, Peter Horan, personally ordered employees of Twelvefold to transfer a copy of the RTR source code to Twelvefold's creditors, believed to include the Financing Entities.[4]  The SAC alleges that "Horan and other Twelvefold personnel were ordered to carry out copying the RTR source repository and distribute it to Kinetic in New York and to an escrow service."  At Twelvefold's instruction, a new source code repository was established with Atlassian, which is a competitor of Github.

---

[4] It is unclear from the allegations in the SAC whether this order was given in response to a request from the Financing Entities.  The SAC alleges that the order from Horan was given in 2015.  It also alleges that the request from the Financing Entities was communicated in May 2016.  Despite the lack of clarity regarding the timeline of events, it is at least clear that, at some point, the RTR software was transferred to Kinetic.

NLA repeatedly objected to the transfer of the RTR software.  NLA's CEO personally informed Twelvefold and Costella Kirsch that NLA owned the rights to RTR and had not been paid for it.  NLA alleges that it is aware of emails exchanged during the period between May and June of 2016 between Twelvefold, Kinetic, Costella Kirsch, and a Blue Chip Defendant regarding the RTR software and NLA's claim to ownership thereof.

The SAC alleges that the Financing Entities "gained control" over Twelvefold and Kinetic through "lending, equity, or other financial transactions," but the details of those transactions and the Financing Entities' role in them are not described in the SAC.  The Financing Entities "partially or completely owned and/or controlled both Twelvefold and Kinetic." Various personnel from the lending entities participated actively in the asset sale as well as in the management and operations of Kinetic.

Following the asset sale, Kinetic issued a one million dollar note (the "Note") to NLA for a "setup fee, as well as a separate equipment rental agreement for NLA's servers," which were located at INAP's facility in New Jersey.  Kinetic defaulted on the Note and the rental agreement in 2016.  To date it has not paid for its use of RTR, despite continuing to use the software.

NLA filed suit against Kinetic for nonpayment of its obligations under the Note in New York Supreme Court in November 2017 and obtained an $893,570.09 judgment against Kinetic on May 18, 2018. Also in 2017, NLA filed an action in New Jersey Superior Court against INAP and Kinetic. In March 2018, NLA obtained an order of replevin from that court to repossesses its servers from INAP and Kinetic, as well as a judgment against Kinetic related to Kinetic's unpaid lease agreement with NLA. NLA alleges that INAP has refused to provide access to the servers in accordance with the order of replevin.

During the pendency of the New Jersey action, Kinetic sold its assets, including the RTR software, in a private asset sale to Spectrum Media Services LLC ("Spectrum"). NLA alleges that the sale was conducted with the knowledge and consent of the Financing Entities because their personnel were copied on "notices and correspondence" concerning the sale on November 14, 2017. Multiplier and the Blue Chip Defendants are alleged to have had control over Spectrum through their investments in that company, and to have caused the RTR software to be copied and transferred from Kinetic to Spectrum. NLA again contacted the Blue Chip Defendants to object to the sale of the RTR software. Spectrum has continued to access and modify the RTR software through NLA's Github repository as recently as April 13, 2018.

In March 2018, an INAP employee in New York informed NLA
that, at Spectrum's request, it had set up a high-speed network
connection between NLA's servers located in INAP's facility in
Secaucus, New Jersey, and Spectrum's servers in that same
facility.  Such a connection is known as a "cross connect" and
involves physically connecting the two servers using network
cables.  NLA alleges that this "cross connect" was used to copy
the RTR software from NLA's servers onto Spectrum's servers.
NLA did not consent to the establishment of the cross connect or
the copying of the RTR software onto Spectrum's servers.  NLA
further alleges that INAP personnel in New Jersey, at the
direction of an INAP employee in New York, provided access to
the locked cage in which its servers were stored and installed
the cross connect cable.  NLA had notified INAP of the ongoing
legal proceedings against Kinetic and had specifically
instructed INAP that no access to the servers was to be allowed.
The SAC alleges that NLA's contracts with INAP, including a
"Master Services Agreement" ("MSA"), do not allow INAP to
provide third parties with access to equipment or software, and
that INAP has a "general policy" against permitting such access.
NLA also requested that INAP shut down NLA's servers, but INAP
refused to do so.

    NLA commenced this action against Kinetic, Spectrum, and
INAP on August 20, 2018, asserting three claims for copyright

infringement.  On October 30, NLA filed a first amended complaint ("FAC"), which added the Financing Entities (Costella Kirsch, the Blue Chip Defendants, and Multiplier) and Western Alliance Bancorporation ("WAB") as defendants.  The FAC also added claims for breach of contract, conversion, and tortious interference under New York law, as well as claims under the New Jersey Computer Act ("NJCA") and the federal Computer Fraud and Abuse Act ("CFAA").  After multiple defendants filed motions to dismiss the FAC, an Order of November 29 directed NLA to file any further amended complaint by December 21 and advised NLA that it was unlikely to have a further opportunity to amend. NLA filed a Second Amended Complaint ("SAC") on December 21, thereby mooting the motions to dismiss.  The SAC asserts the same claims as the FAC against the same defendants.

Kinetic has not appeared and has not answered any of the complaints filed in this action.  Accordingly, an Order of Default was entered against Kinetic on March 14, 2019.

On January 16, 2019, Spectrum and Multiplier answered the SAC, and the Blue Chip Defendants, INAP, WAB, and Costella Kirsch moved to dismiss the SAC for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P.  The Blue Chip Defendants and INAP additionally moved to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), Fed. R. Civ. P. WAB was voluntarily dismissed from this action on January 30,

2019.  The motions to dismiss became fully submitted on February

15, 2019.  On February 22, Spectrum and Multiplier moved for

judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ.

P., joining in arguments made by the other moving defendants.

Those motions became fully submitted on March 15.

## **Discussion**

I. Personal Jurisdiction

INAP and the Blue Chip Defendants have moved to dismiss the

claims against them pursuant to Rule 12(b)(2), Fed. R. Civ. P.

on the basis that this Court lacks personal jurisdiction over

them.  That motion is denied.

> In order to survive a motion to dismiss for lack
> of personal jurisdiction, a plaintiff must make a
> prima facie showing that jurisdiction exists.  A
> plaintiff must include an averment of facts that, if
> credited by the ultimate trier of fact, would suffice
> to establish jurisdiction over the defendant.

SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 342 (2d Cir. 2018)

(citation omitted).  A court "constru[es] all pleadings and

affidavits in the light most favorable to the plaintiff and

resolv[es] all doubts in the plaintiff's favor."  Id.  "Where .

. . a court relies on pleadings and affidavits, rather than

conducting a full-blown evidentiary hearing, the plaintiff need

only make a prima facie showing that the court possesses

personal jurisdiction over the defendant."  DiStefano v. Carozzi

N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).

In determining whether personal jurisdiction exists, "a court must first look to the long-arm statute of the forum state. If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process." Friedman v. Bloomberg L.P., 884 F.3d 83, 90 (2d Cir. 2017) (en banc) (citation omitted).

The SAC pleads contract claims against INAP and tort claims against INAP and the Blue Chip Defendants. New York's Long Arm Statute, N.Y. C.P.L.R. § 302(a)(1) provides that a defendant is subject to personal jurisdiction in New York when "(1) the defendant transacted business within the state; and (2) the claim asserted arises from that business activity." Licci by Licci v. Lebanese Canadian Bank, SAL, 834 F.3d 201, 209 (2d Cir. 2016) (citation omitted). In order to make a prima facie showing that personal jurisdiction exists under this section, a defendant must allege "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007). Section 302(a)(2) of New York's long arm statute confers personal jurisdiction upon a person who "commits a tortious act within the state . . . ." N.Y. C.P.L.R. § 302(a)(2). Section 302(a)(3) of New York's long arm statute

> confers personal jurisdiction over an individual who
> commits a tortious act without the state causing
> injury to person or property within the state if he
> expects or should reasonably expect the act to have
> consequences in the state and derives substantial
> revenue from interstate or international commerce.

Troma Entm't, Inc. v. Centennial Pictures Inc., 729 F.3d 215,

218 (2d Cir. 2013). "It is well-settled that residence or

domicile of the injured party within New York is not a

sufficient predicate for jurisdiction under section 302(a)(3)."

Id.

Three conditions must be met for the exercise of specific

jurisdiction over a nonresident defendant to satisfy the

requirements of due process.

> First, the defendant must have purposefully availed
> itself of the privilege of conducting activities
> within the forum State or have purposefully directed
> its conduct into the forum State. Second, the
> plaintiff's claim must arise out of or relate to the
> defendant's forum conduct. Finally, the exercise of
> jurisdiction must be reasonable under the
> circumstances.

U.S. Bank Nat'l Ass'n v. Bank of Am. N.A., 916 F.3d 143, 150 (2d

Cir. 2019) (citation omitted). "When the underlying dispute

involves a contract, we use a highly realistic approach and

evaluate factors such as prior negotiations and contemplated

future consequences, along with the terms of the contract and

the parties' actual course of dealing." Id. at 151. The Second

Circuit has "found that a claim arises out of forum contacts

when defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." Id.

A. INAP

INAP is subject to specific personal jurisdiction in New York.[5] NLA and Spectrum are New York-based companies. NLA's claims against INAP arise out of its contract with INAP and out of allegedly tortious conduct by INAP in New York. NLA's allegations are sufficient to make a prima facie showing that the exercise of personal jurisdiction is appropriate under both New York's long arm statute and due process principles.

B. The Blue Chip Defendants

The Blue Chip Defendants each have their principal places of business in Ohio and are incorporated in Ohio and Delaware. NLA has made a prima facie showing that the Blue Chip Defendants are subject to specific personal jurisdiction in New York. NLA has alleged that, while in New York, the Blue Chip defendants entered into transactions with Twelvefold and Kinetic -- both New York entities. NLA's claims against the Blue Chip Defendants arise from those transactions.

---

[5] NLA also argues that INAP is subject to general jurisdiction in New York, despite the SAC's allegation that INAP is a Delaware Corporation with its principal place of business in Virginia. Because INAP is subject to specific jurisdiction in New York, this argument is not addressed.

## II. Venue

INAP has moved to dismiss on the ground that this lawsuit has been filed in the wrong venue. It seeks to enforce the forum selection clause in its contract with NLA. Its motion is granted.

NLA's claims against INAP in this action are foreclosed by the broad and mandatory forum selection clause contained in the MSA. NLA bases its breach of contract claim on "a contract between NLA and INAP, including but not limited to the Master Services Agreement." It then purports to quote from that alleged contract. NLA did not attach any written contract to its SAC. In connection with its motion to dismiss, INAP has submitted a copy of what it asserts is its MSA with NLA. Puzzlingly, NLA now disclaims having ever signed that MSA -- or indeed, any MSA -- with INAP, despite quoting from it in the SAC.

INAP, in its reply, has submitted a sales order executed between it and NLA on January 8, 2016.[6] That sales order was

---

[6] This document may appropriately be considered on a motion to dismiss because it is integral to the complaint. Here, as in "most instances" where courts have considered a document "integral to the complaint," "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason -- usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's

signed by David Simon on NLA's behalf, and incorporated the MSA

by reference.[7]  The MSA contains a broad forum selection clause,

which states:

> Any and all claims arising out of or relating to this
> Agreement shall be brought in a state or federal court
> of competent jurisdiction in Atlanta, Georgia.
> Customer [NLA] consents to the personal and subject
> matter jurisdiction of the state and/or federal courts
> located in Atlanta, Georgia and waives (a) any
> objection to jurisdiction or venue, or (b) any defense
> claiming lack of jurisdiction or improper venue, in
> any action brought in such courts.

(Emphasis supplied.)

The Second Circuit has set forth a four-part test for

determining whether to dismiss a claim based on a forum

selection clause.  That test asks:

> (1) whether the clause was reasonably communicated to
> the party resisting enforcement; (2) whether the
> clause is mandatory or permissive, i.e., whether the
> parties are required to bring any dispute to the
> designated forum or simply permitted to do so; and (3)
> whether the claims and parties involved in the suit
> are subject to the forum selection clause.  If the
> forum clause was communicated to the resisting party,
> has mandatory force and covers the claims and parties
> involved in the dispute, it is presumptively
> enforceable.  A party can overcome this presumption by
> (4) making a sufficiently strong showing that
> enforcement would be unreasonable or unjust, or that

---

claim -- was not attached to the complaint." Goel v. Bunge,
Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

[7] "[P]arties to a contract are plainly free to incorporate by
reference, and bind themselves inter sese to, terms that may be
found in other agreements." Aceros Prefabricados, S.A. v.
TradeArbed, Inc., 282 F.3d 92, 97 (2d Cir. 2002) (citation
omitted).

the clause was invalid for such reasons as fraud or
        overreaching.

Starkey v. G. Adventures, Inc., 796 F.3d 193, 196 (2d Cir. 2015)

(citation omitted).  "A forum selection clause is viewed as

mandatory when it confers exclusive jurisdiction on the

designated forum or incorporates obligatory venue language."

Phillips v. Audio Active Ltd., 494 F.3d 378, 386 (2d Cir. 2007).

The Second Circuit has recognized a "strong public policy" in

favor of forum selection.  Roby v. Corporation of Lloyd's, 996

F.2d 1353, 1361 (2d Cir. 1992).

        The forum selection clause here is mandatory and

enforceable.  The clause was reasonably communicated to NLA when

it signed the sales order.  The sales order clearly states, in

all capital letters, that the order will be governed by the MSA

entered into between the parties or, if the parties have not

entered into an MSA, by the generic MSA provided on INAP's

website, the URL for which is provided in the sales order.[8]  The

clause also contains mandatory language.  NLA has not attempted

to make a showing that enforcement of the clause would be

unreasonable or unjust, or that the clause is invalid for fraud

or overreaching.

---

[8] Although NLA's opposition to this motion asserted that it had
not "signed" an MSA, that argument does not prevent dismissal.
NLA relies on the MSA in its SAC and it has not contested that
the signed sales order incorporating the MSA bears its agent's
signature.

Each of the claims asserted against INAP in this action "arise out of or relate to" its contractual relationship with NLA. "[W]hen ascertaining the applicability of a contractual provision to particular claims, we examine the substance of those claims, shorn of their labels." Phillips, 494 F.3d at 388. At bottom, INAP is alleged to have accessed NLA's servers in its facility in breach of the contractual arrangement between the parties. Each of the claims will stand or fall based on whether and to what extent INAP's actions were authorized by the MSA. Further, the MSA contains a limitation of liability clause that could potentially affect NLA's tort claims.

NLA argues, without further elaboration, that "INAP's collusion with Spectrum to steal information and data from NLA's server does not flow out of any contract or deal negotiated between NLA and INAP, and would be a completely unforeseeable event," given INAP's advertising regarding the security of its systems. This argument is unpersuasive. The phrase "arising out of or relating to" is a broad clause. See Collins & Aikman Products Co. v. Building Systems, Inc., 58 F.3d 16, 20 (2d Cir. 1995) (the phrase "any claim or controversy arising out of or relating to the agreement" is "the paradigm of a broad clause"). NLA cites no law and makes no developed argument in support of its implication that the forum selection clause covers only

17

"foreseeable" events.  NLA's claims against INAP must be

dismissed without prejudice to their being refiled in Georgia.

III. Failure to State a Claim

The Financing Entities and Spectrum seek to dismiss the

statutory and tort claims asserted against them pursuant to

Rules 12(b)(6) and 12(c), Fed. R. Civ. P., on the ground that

NLA has failed to state a claim against them.[9]  The motions of

the Financing Entities are granted.  Spectrum's motion is

granted in part.

"To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face."  Sierra Club v. Con-

Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation omitted).

A claim to relief is plausible when the factual allegations in a

complaint "allow[] the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."

Progressive Credit Union v. City of New York, 889 F.3d 40, 48

(2d Cir. 2018) (citation omitted).  "[T]hreadbare recitals of

the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Carlin v. Davidson Fink LLP, 852

F.3d 207, 212 (2d Cir. 2017).  The plaintiff must plead enough

---

[9] "The same standard applicable to Fed. R. Civ. P. 12(b)(6)
motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for
judgment on the pleadings."  Bank of New York v. First
Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010).

facts to "nudge[] [his] claims across the line from conceivable to plausible . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor." Coalition for Competitive Electricity, Dynergy Inc. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018) (citation omitted). "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (citation omitted). A court may also consider documents that are "integral to the complaint." Goel, 820 F.3d at 559. "A document is integral to the complaint where the complaint relies heavily upon its terms and effect." Id. A court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit . . . ." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000). A court may also take judicial notice of "relevant matters of public record." Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012).

The owner of a copyright holds six exclusive rights under 17 U.S.C. § 106. Those are the rights to "reproduce the work,

prepare derivative works, distribute the work to the public, perform the work, display the work, and perform the work by means of digital transmission." John Wiley & Sons, Inc. v. DRK Photo, 882 F.3d 394, 402 (2d Cir. 2018) (citing 17 U.S.C. § 106). To state a claim for infringement of one of these six exclusive rights, "a plaintiff must allege both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." Spinelli v. Nat'l Football League, 903 F.3d 185, 197 (2d Cir. 2018) (citation omitted). Copyright infringement may be direct, contributory, or vicarious. "A person infringes contributorily by inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it. Without a showing of a direct copyright infringement, secondary liability cannot be maintained." Id. (citation omitted)

The Copyright Act does not expressly create liability for contributory infringement. Rather, contributory infringement is based upon "the common-law doctrine that one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citation omitted). Thus,

> one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another may be held liable as a 'contributory' infringer. The knowledge standard is an objective one; contributory liability is imposed on

persons who know or have reason to know of the direct
infringement.  Such liability exists if the defendant
engages in personal conduct that encourages or assists
the infringement.  The resolution of the issue depends
upon a determination of the function that the alleged
infringer plays in the total reproduction process.

Id. at 117-18 (citation omitted) (emphasis omitted).

Similarly, liability for vicarious infringement arises not

from the text of the Copyright Act, but from the common law

doctrine of respondeat superior.

The common law imposes liability for vicarious
copyright infringement when the right and ability to
supervise coalesce with an obvious and direct
financial interest in the exploitation of copyrighted
materials -- even in the absence of actual knowledge
that the copyright monopoly is being impaired.

Viacom Intern., Inc. v. YouTube, Inc., 676 F.3d 19, 36 (2d Cir.

2012) (citation omitted).

"To state a claim for breach of contract under New York

law, the complaint must allege: (i) the formation of a contract

between the parties; (ii) performance by the plaintiff; (iii)

failure of defendant to perform; and (iv) damages."  Nick's

Garage, Inc. v. Progressive Casualty Ins. Co., 875 F.3d 107, 114

(2d Cir. 2017) (citation omitted).

Under New York law,

[a] conversion takes place when someone, intentionally
and without authority, assumes or exercises control
over personal property belonging to someone else,
interfering with that person's right of possession.
Two key elements of conversion are (1) plaintiff's
possessory right or interest in the property and (2)

21

defendant's dominion over the property or interference
with it, in derogation of plaintiff's rights.

Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50
(2006); see also Pappas v. Tzolis, 20 N.Y.3d 228, 234 (2012).

"Tortious interference" includes interference with contract
or business relations. To state a claim for tortious
interference under New York law, a plaintiff must show "(1) the
existence of a valid contract between the plaintiff and a third
party, (2) the defendant's knowledge of that contract, (3) the
defendant's intentional procurement of a third-party's breach of
contract without justification, and (4) damages." Kaplan v.
Reed Smith LLP, __ F.3d __, 2019 WL 1246305 at *4 (2d Cir. Mar.
19, 2019) (citation omitted). To state a claim for tortious
interference with business relations under New York law four
conditions must be alleged:

> (i) the plaintiff had business relations with a third
> party; (ii) the defendants interfered with those
> business relations; (iii) the defendants acted for a
> wrongful purpose or used dishonest, unfair, or
> improper means; and (iv) the defendants' acts injured
> the relationship.

Scutti Enterprises, LLC v. Park Place Entertainment. Corp., 322
F.3d 211, 215 (2d Cir. 2003) (citation omitted).

The New Jersey Computer Act (NJCA), NJ Rev. Stat. §2A:38A-
3, provides, in pertinent part:

> A person or enterprise damaged in business or property
> as a result of any of the following actions may sue
> the actor therefor . . . :

> a. The purposeful or knowing, and unauthorized
> altering, damaging, taking or destruction of any data,
> data base, computer program, computer software or
> computer equipment existing internally or externally
> to a computer, computer system or computer network;
>
> . . .
>
> c. The purposeful or knowing and unauthorized
> accessing or attempt to access any computer, computer
> system or computer network;
>
> . . .
>
> e. The purposeful or knowing accessing and reckless
> altering, damaging, destroying or obtaining of any
> data, data base, computer, computer program, computer
> software, computer equipment, computer system or
> computer network.

A claim under the NJCA "requires proof of some activity vis-à-vis the information other than simply gaining access to it."  In re Nickelodeon Consumer Privacy Litigation, 827 F.3d 262, 277 (3d Cir. 2016) (citation omitted).  Courts have interpreted the NJCA "in harmony with its federal counterpart," the CFAA.  Id. at 278.

Similarly, the CFAA, 18 U.S.C. § 1030(a)(2), establishes criminal liability for any person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . (C) information from any protected computer."  18 U.S.C. § 1030(a)(5)(A) establishes criminal liability for any person who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization,

to a protected computer." The CFAA provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). Only certain types of damage are compensable under Section 1030(g). The categories relevant to this action are: "(I) loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value;" and "(VI) damage affecting 10 or more protected computers during any 1-year period." Id. § 1030(c)(4)(a)(i). Damages under the first of these categories are limited to economic damages. Id. § 1030(g); Hancock v. County of Rensselaer, 882 F.3d 58, 63-64 (2d Cir. 2018). A number of courts in this district have held that losses under the CFAA "are compensable only when they result from damage to, or the inoperability of, the accessed computer system." Civic Center Motors, Ltd. v. Mason Street Import Cars, Ltd., 387 F. Supp. 2d 378, 381 (S.D.N.Y. 2005); see also Massre v. Bibiyan, 12cv6615 (KPF), 2014 WL 2722849 at *3 (S.D.N.Y. June 16, 2014); Poller v. BioScrip, 974 F. Supp. 2d 204, 232 (S.D.N.Y. 2013); Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004).

A. Copyright Infringement

NLA's copyright claims against Spectrum survive.[10] Spectrum's only argument with respect to NLA's copyright claims is that these are barred by the doctrine of election of remedies. They argue that, because NLA already obtained a judgment from the New York Supreme Court against Kinetic for breach of its Note, it cannot also recover in copyright. This argument is unpersuasive. While it is generally true that a plaintiff is not entitled to recover twice for the same injury, it is not clear on the face of the SAC that the NLA's award against Kinetic from the New York Supreme Court is addressed to the same injury.

The one million dollar Note that Kinetic gave to NLA was allegedly for a "setup fee." The Blue Chip Defendants have submitted a copy of that Note, which is integral to the complaint, with their moving papers. There is no indication on the face of that document that the Note was given in exchange for a license to use the RTR software, or in satisfaction of Twelvefold's obligations to NLA. Rather, it recites that the Note was given "in connection with an infrastructure service

---

[10] While the SAC requests statutory damages and attorneys' fees pursuant to 17 U.S.C. §§ 504 and 505, NLA has withdrawn that request in its opposition. Accordingly, the request for statutory damages is dismissed and only the requests for actual damages and an injunction survive.

setup fee for services to be provided by [NLA] to [Kinetic]."
NLA alleges that it performed the promised services, and Kinetic
defaulted on the Note.

The moving defendants[11] observe that the obligations
memorialized in the Note are contingent on an asset purchase
agreement between Kinetic and Bridge Bank for the assets of
Twelvefold.  This has little relevance to the analysis.  The
Note does not define or describe Twelvefold's assets, and the
core allegation of the SAC is that the RTR software was not an
asset of Twelvefold.

While NLA has pleaded a claim of direct infringement by
Spectrum, it has not pleaded sufficient facts to plausibly
allege a claim for direct infringement against any of the
Financing Entities.  NLA simply alleges, in a conclusory manner,
that the Financing Entities directly infringed NLA's copyright
by distributing RTR to Kinetic, and then to Spectrum, in
connection with the asset sales.  Beyond conclusory assertions,
nothing in the SAC describes any act or acts taken by any of the
Financing Entities that could plausibly be understood to
constitute direct infringement.  Indeed, the gravamen of the SAC

---

[11] Spectrum has joined in arguments made by several of the moving
defendants, pursuant to the Court's instruction at a conference
held on February 8, 2019.  NLA's argument that Spectrum's
incorporation of these arguments by reference was improper is
without merit.

is that other parties copied and distributed the RTR software.
NLA's claims for direct infringement against the Financing
Entities, therefore, must be dismissed.

B. Contributory Infringement

NLA has also failed to state a claim for contributory
infringement against the Financing Entities.  It has not
plausibly alleged that they induced or encouraged the direct
infringement by Kinetic or Spectrum; it has not pleaded
sufficient non-conclusory facts to "nudge[] [its] claims across
the line from conceivable to plausible . . . ."  Twombly, 550
U.S. at 570.

NLA has cited email communications in which Kinetic's Chris
McCleary directed Twelvefold personnel to place the software in
escrow for eventual transfer to Kinetic.  A conclusory
allegation that McCleary was also acting as the Blue Chip
Defendants' "agent" is insufficient to satisfy NLA's Rule 8
pleading burden.  The existence of a principal-agent
relationship is a mixed question of law and fact.  Commercial
Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462
(2d Cir. 2003).  "Establishment of such relationship requires
facts sufficient to show (1) the principal's manifestation of
the intent to grant authority to the agent, and (2) agreement by
the agent."  Id.  Although NLA alleges elsewhere in the
complaint that McCleary is a current Managing Director and

former Venture Partner of Blue Chip Venture Company Ltd.,[12] the SAC contains insufficient factual allegations to support a legal conclusion that McCleary was acting as Blue Chip's agent at the time he sent this email.

NLA has also cited to an email in which a partner of Costella Kirsch stated that Costella Kirsch was "okay with" McCleary's request to transfer the software to escrow prior to Kinetic's purchase of Twelvefold's assets.  This falls short of NLA's burden under Rule 8 to plausibly allege that Costella Kirsch knowingly induced, caused, or materially contributed to Kinetic's infringement.  NLA has made no factual allegations to support an inference that Costella Kirsch had any involvement at all in Spectrum's alleged infringement.

The sole non-conclusory factual allegation regarding Multiplier's involvement in the alleged infringement is the existence of unspecified communications making Multiplier aware of NLA's objections to the transfer of the RTR software.  This is similarly insufficient to satisfy NLA's burden to plead contributory infringement under Rule 8.

---

[12] As noted above, Blue Chip Venture Company Ltd. has asserted that it had no role in this transaction and is not a proper party to this action.

C. Vicarious Infringement

NLA has also failed to state a claim against any of the Financing Entities for vicarious infringement.  In support of its claims for vicarious infringement, NLA makes several conclusory allegations regarding the Financing Entities' ownership and control of Twelvefold, Kinetic, and Spectrum.  It is well settled that corporate ownership and control is insufficient to establish vicarious liability for torts committed by a corporate entity.  See, e.g., United States v. Bestfoods, 524 U.S. 51, 61 (1998).  Moreover, NLA's allegations that certain individuals who were affiliated with the Financing Entities also had roles in the management and operation of Twelvefold, Kinetic, or Spectrum are insufficient to state a claim for vicarious liability.  NLA's allegations in this respect are vague and conclusory and fail to satisfy its Rule 8 pleading burden.

D. State Law Claims

NLA's claims for conversion, tortious interference, and violation of the NJCA are preempted by the federal Copyright Act.  A state law claim is preempted by the Copyright Act when a plaintiff "seeks to vindicate a legal or equitable right that is equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106."  Forest Park

Pictures v. Universal Television Network, Inc., 683 F.3d 424,

430 (2d Cir. 2012) (citation omitted).

> A state law right is equivalent to one of the
> exclusive rights of copyright if it may be abridged by
> an act which, in and of itself, would infringe one of
> the exclusive rights.  But if an extra element is
> required instead of or in addition to the acts of
> reproduction, performance, distribution or display, in
> order to constitute a state-created cause of action,
> there is no preemption.

Id. (citation omitted); see also Fin. Info, Inc. v. Moody's

Investor Serv., Inc., 808 F.2d 204, 208 (2d Cir. 1986).  The

extra elements of the state law claim must be "qualitatively

different" from the copyright infringement claim.  Briarpatch

Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir.

2004).  "To determine whether a claim is qualitatively

different, we look at what the plaintiff seeks to protect, the

theories in which the matter is thought to be protected and the

rights sought to be enforced."  Id. at 306 (citation omitted)

The Second Circuit takes "a restrictive view of what extra

elements transform an otherwise equivalent claim into one that

is qualitatively different from a copyright infringement claim."

Id.

NLA's conversion claims are preempted by the Copyright Act.

The SAC alleges that the defendants "converted the computer

hardware, software, and intellectual property of NLA for their

own use."  This is simply a restatement of NLA's claims under

the Copyright Act for unlawful copying and distribution.  The
conversion claims are not "qualitatively different" from NLA's
copyright claims.  The allegation that certain defendants
physically interfered with NLA's property by accessing their
servers and establishing a "cross connect" does not save the
conversion claim.  "Conversion requires not merely temporary
interference with property rights, but the unauthorized dominion
and control to the complete exclusion of the rightful
possessor."  Harper & Row Publishers, Inc. v. Nation
Enterprises, 723 F.2d 195, 201 (1983).  For that reason, the
Second Circuit held in Harper & Row that "[m]erely removing one
of a number of copies of a manuscript (with or without
permission) for a short time, copying parts of it, and returning
it undamaged, constitutes far too insubstantial an interference
with property rights to demonstrate conversion."  Id.  The same
principle applies here -- merely accessing NLA's server and
temporarily attaching a cross connect for the purposes of
copying and distributing the RTR software do not constitute an
act of conversion that is qualitatively different from the act
of copyright infringement.  The gravamen of the claim is still
the copying and distribution of the RTR software.  Count 5 of
the SAC must therefore be dismissed.

NLA's claims for tortious interference are also preempted
by the Copyright Act.  The basis of NLA's tortious interference

claim is that the defendants tortiously interfered with NLA's business relationships with Kinetic and Spectrum by inducing them to copy and distribute the RTR software without paying for it. Again, this simply restates NLA's claims under the Copyright Act, and does not qualitatively differ from those claims. Count 6 of the SAC must therefore be dismissed.

NLA's claims under the NJCA are also preempted by the Copyright Act. NLA notes that the NJCA requires an "extra element" that its copyright claims do not -- unauthorized access to a computer. Merely accessing a computer, however, is insufficient to establish liability under the NJCA. Rather, a plaintiff must show that it was "damaged in business or property." P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir. 2005) (citation omitted). In order to sustain a claim under the NJCA, NLA must therefore show that the defendants did more than "gain access to their information." In re Nickelodeon, 827 F.3d at 277. The "something more" here is that the defendants deprived NLA of revenue by accessing, copying, and distributing the RTR software. Again, this merely restates NLA's copyright claims. The conduct for which NLA seeks to recover under the NJCA is not "qualitatively different" from the conduct that forms the basis of its copyright claims.

E. CFAA

NLA's CFAA claim fails because it has failed to adequately allege that it suffered losses that are compensable under that statute.  Although NLA has alleged that it had ten or more computers in a locked cage at INAP's datacenter when that cage was accessed by INAP and Spectrum, it has not alleged any damage to those computers.  NLA has also alleged that it has suffered damages that exceed $5,000 because, prior to Spectrum's infringement, Kinetic offered to pay "hundreds of thousands of dollars" as a setup fee, which Spectrum declined to pay.  There is no allegation, however, that these alleged economic losses arose from damage to, or interoperability of, any of the allegedly accessed computers.  Rather, NLA's claim for damages under the CFAA is merely duplicative of its claim for copyright damages.  These damages are not compensable under the CFAA.

## Conclusion

The Blue Chip Defendants' January 16, 2019 motion to dismiss is granted.  Costella Kirsch's January 16 motion to dismiss is granted.  INAP's January 16 motion to dismiss is granted without prejudice to NLA refiling its claims in the appropriate venue.  Multiplier's February 22 motion for judgment on the pleadings is granted.  Spectrum's February 22 motion for judgment on the pleadings is granted in part; the copyright

infringement claims against it survive to the extent that NLA
seeks actual damages and an injunction.

Dated:    New York, New York
          April 11, 2019

                              _____
                                        DENISE COTE
                              United States District Judge